UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  1:20-cr-543-RMB |
| v. | : | |
| HANIEFF TRUSTY | : | March 7, 2025 |

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

The following reply memorandum in support of Defendant's motion to dismiss responds to legal and factual claims by the government as well as to developments in Third Circuit caselaw on this topic, particularly *Range v. Att'y Gen.*, 124 F.4th 218 (3d Cir. 2024) (*en banc*) (*Range II*).

### AT THE TIME OF HIS ARREST MR. TRUSTY WAS NOT SUBJECT TO ANY CRIMINAL JUSTICE SENTENCE AND HIS CRIMINAL HISTORY WAS LIMITED TO NON-VIOLENT DRUG OFFENSES FOR WHICH HE HAD BEEN RELEASED FROM PRISON OVER A DECADE EARLIER

At the time of his arrest in this case in 2020, Mr. Trusty was 35 years old. He had previously been incarcerated as an adult a single time: between 2006 and 2009—when Hanieff was 21 to 24 years old—he was incarcerated for approximately 29 months. This prison term was imposed in connection with convictions for non-violent drug-related conduct Mr. Trusty engaged in when he was between 20 and 21 years old. At the time of his arrest on January 14, 2020, consequently, <u>Hanieff Trusty had not been subject to any prison sentence or supervision for over a decade</u>.

**THE THIRD CIRCUIT'S REISSUED EN BANC DECISION IN *RANGE* GOVERNS THIS CASE**

Late last year, subsequent to the filing of Defendant's motion to dismiss, the *en banc* Third Circuit reaffirmed its prior decision in *Range v. Att'y Gen*., 69 F.4th 96 (3d Cir. 2023) (*en banc*) (Range I), cert. granted, judgment vacated, 144 S. Ct. 2706 (2024). The overwhelming majority of the *en banc* court joined the majority, with 10 judges in the majority, four concurring in the judgment, and only two dissenting. *See generally id*. Indeed, two of the judges also switched from dissenting to concurring between *Range I* and *II*.

In striking down § 922(g)(1) as-applied, the Third Circuit rejected every argument raised by the government. On *Bruen*'s first step, it held that the plain text of the Second Amendment covered Mr. Range's conduct, and so the Constitution presumptively protected it. *See Range II*, 124 F.4th at 225-28 (citing *Bruen*, 597 U.S. at 17). The court repudiated the government's argument that felons are not among "the people" protected by the Second Amendment. *Id*. at 226-28. The court explained that the government's limitation would write felons entirely out of other protections under the First and Fourth Amendments. *Id*. at 226. Moreover, it would run afoul of history and the reasoning of *Rahimi*, and improperly defer to legislatures to decide whom to exclude from "the people." *Id*. at 227. Having determined that felons are still "people" in the eyes of the Constitution, the Third Circuit easily held that § 922(g)(1) regulates Second Amendment conduct, because *Range*'s proposed conduct included possession of a rifle to hunt and defend his home. *Id*. at 228. Any argument to the contrary is now expressly foreclosed in this Circuit.

The *Range II* court then turned to *Bruen*'s second step: the government's burden to show that "applying § 922(g)(1) to Mr. Range would be consistent with the Nation's historical tradition of firearm regulation." *Id*. The government did not meet that burden. The Third Circuit rejected the government's proposed reliance on Supreme Court dicta about "longstanding prohibitions on

the possession of firearms by felons." *Id.* at 228-29. It also found the government's historical evidence insufficient. It explained that the cited "status-based restrictions"—those disarming "Loyalists, Native Americans, Quakers, Catholics, and Blacks"—would be unconstitutional today and any analogy to Mr. Range would be "far too broad." *Id.* at 229-30 (quoting *Bruen*, 597 U.S. at 31). The court further distinguished between the holding in *Rahimi* and the government's too-broad and historically unsupported principle that "American legislatures disarmed classes of individuals who posed a danger of misusing firearms." *Id.* at 230.

The court noted that "*Rahimi* did bless disarming (at least temporarily) physically dangerous people." *Id.* But the government failed to show historical evidence for a broader principle, and failed to show that Mr. Range could be disarmed under the limited "physical danger" principle from *Rahimi*. *Id.* The government sought to "stretch dangerousness to cover all felonies" and argued that all those "convicted of serious crimes, as a class, can be expected to misuse firearms." *Id.* But that principle was "far too broad," *id.* (quoting *Bruen*, 597 U.S. at 31), and operates "at such a high level of generality that it waters down the right," *id.* (quoting *Rahimi*, 602 U.S. at 1926 (Barrett, J., concurring)). The court also rejected the government's historical comparison to the use of capital punishment for certain felons at the founding, explaining that the "Founding-era practice of punishing some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue here … is rooted in our Nation's history and tradition." *Id.* It similarly rejected reliance on historical forfeiture laws. *Id.*

While the *Range II* majority emphasized that its decision is a "narrow one," it demonstrates the considerable burden the government bears to establish a historical tradition of disarming felons pursuant to § 922(g)(1). *Id.* at 232. As one dissenting judge commented, "the analytical framework [the majority] applies to reach its conclusion could be read to render most, if not all, felon bans

unconstitutional." *Id.* at 290 (Shwartz, J., dissenting). As outlined below, the government has not satisfied its substantial burden here.

## *BRUEN* STEP ONE:
## CARRYING A FIREARM IS COVERED BY THE SECOND AMENDMENT

*Bruen*'s first step asks a straightforward question of whether the Second Amendment protects the regulated conduct. *See Bruen*, 597 U.S. at 24. The government appears to recognize that the law presently forecloses any argument that Mr. Trusty is not among "the people" protected by the text of the Second Amendment. *See* ECF No. 89 at 6 n.3.[1] Nor does the government appear to dispute that firearm or ammunition possession—the only conduct prohibited by § 922(g)(1)— is plainly protected conduct. *Bruen's* step one analysis appropriately ends there.

Nevertheless, the government argues that Mr. Trusty' challenge fails on *Bruen*'s first step because he has not shown that he "possessed the charged gun for 'ordinary self-defense needs.'" ECF No. 89 at 8. The Third Circuit's decision in *United States v. Moore* forecloses this effort by the government to contrive an elaborate burden upon defendant's challenging § 922(g). The *Moore* court addressed the step one analysis under *Bruen* as follows:

> The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As an adult citizen, Moore is one of the "people" whom the Second Amendment presumptively protects. *See Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 127 (3d Cir. 2024). And **the charge at issue punishes Moore for quintessential Second Amendment conduct: possessing a handgun**. *See District of Columbia v. Heller,* 554 U.S. 570, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). **So the Government bears the burden of justifying its regulation.**

---

[1] As the government's concession recognizes, the Third Circuit roundly rejected the argument to the contrary again in *Range II*, 124 F.4th at 225-28, and the Supreme Court recently rejected a similar argument in *Rahimi*.

*United States v. Moore*, 111 F.4th 266, 268–69 (3d Cir. 2024) (emphasis added). This passage in *Moore* swiftly but comprehensively addresses the Step 1 issue by recognizing that § 922(g) hits at the heart of "quintessential" Second Amendment conduct and thus the burden necessarily shifts to the government. Tellingly, the government in its submission does not address *Moore* or offer any explanation of how its proposed burden can be squared with *Moore*.

Beyond running contrary to binding circuit authority, the government's argument misunderstands what is at issue in a constitutional challenge—an application of the challenged statute. A Second Amendment challenge does not ask the purely academic question of whether a given person can be disarmed for any reason. It asks whether an *application of a given statute* to that person violates the constitution. That is, does it violate the Second Amendment to charge a defendant for engaging in the specific conduct prohibited by the challenged statute. Courts consider only "applications of the [challenged] statute in which it actually authorizes or prohibits conduct," not circumstances for which the statute is irrelevant. *City of L.A. v. Patel*, 576 U.S. 409, 415-19 (2015); *see also MacDonald v. Moose,* 710 F.3d 154, 166 (4th Cir. 2013); *People v. Burns*, 79 N.E.3d 159, 166 (Ill. 2015) (in a Second Amendment challenge explaining that an "unconstitutional statute does not 'become constitutional' simply because it is applied to a particular category of persons who could have been regulated, had the legislature seen fit to do so").

The conduct "actually prohibited" by § 922(g)(1) is firearm possession. *See Patel*, 576 U.S. at 418. Whether Mr. Trusty possessed this firearm or ammunition for self-defense purposes is irrelevant to the § 922(g)(1) *possession* charge, and therefore not an "application" of the statute. The "circumstances surrounding the possession do not impact the elements of the offense … even if [the defendant] asserted that he possessed the firearm for the purpose of self-defense, he would

still stand accused of violating Section 922(g)(1) because the possession of a firearm for any purpose is a criminal act based on his status as a convicted felon." *United States v. Harper*, 689 F. Supp. 3d 16, 28 (M.D. Pa. 2023), *rev'd on other grounds by United States v. Quailes,* ___ F. 4th ___, 2025 WL 225486 (3d Cir. 2025); *cf. United States v. Zion*, No. 22-cr-527 (EP), 2024 WL 1975497, at *4 (D.N.J. May 3, 2024) (explaining § 922(g)(1) "regulates possession based on felon *status* … [not] unlawful *purpose*").[2] Indeed, far from being an *application* of § 922(g)(1), possession for the exclusive purpose of self-defense would actually be a trial defense to the charge and would likely merit acquittal. *See, e.g.*, *United States v. Alston*, 526 F.3d 91, 94 (3d Cir. 2008) (recognizing that "justification is a valid defense to a felon-in-possession charge"); *United States v. Lemon*, 824 F.2d 763, 765 (9th Cir. 1987) (discussing self-defense jury instruction in § 922(g)(1) case).

The government reads too much into *Bruen*'s references to "proposed course of conduct," to suggest that courts should consider conduct beyond that prohibited by a given statute. *See* ECF No. 89 at 6 (citing *Bruen*, 597 U.S. at 32). This argument ignores that *Bruen* and *Range* are civil, not criminal cases. *See Harper*, 689 F. Supp. 3d at 28 ("In *Bruen* and *Range*, the plaintiff's proposed conduct was readily apparent because they filed lawsuits to allow them to engage in the conduct at issue. In a criminal case, a different approach is required."). Civil constitutional

---

[2] Several of the cases cited by the government for the opposite proposition acknowledge that courts around the Third Circuit have disagreed about whether it is proper to consider the purpose of a defendant's firearm possession. *See United States v. Rogers*, No. 23-cr-582, 2024 WL 2844545, at *6 (D.N.J. June 5, 2024) (citing *United States v. Claiborne*, No. 220cr0672, 2024 WL 112603, at *3 (D.N.J. Jan. 10, 2024)); *United States v. Harris*, No. 2:20-cr-679, 2024 WL 2260907, at *6 (D.N.J. May 17, 2024) ("the Court acknowledges there is some ambiguity regarding Defendant's burden in proving protected conduct at the first stage of the *Bruen* analysis, with some courts finding conduct to be an irrelevant inquiry for § 922(g)(1), given that the statute 'regulates possession based on felon status' rather than based on 'unlawful purpose.'").

challenges involve additional issues like standing and ripeness, which require an allegation of "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *McKay v. Federspiel*, 923 F.3d 862, 870-71 (6th Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014)). Challenges in criminal cases are clearer. The conduct at issue has allegedly already taken place and been charged by the government. Here, it was the mere alleged possession of a firearm. *See United States v. Duarte*, 101 F.4th 657, 670-71 (9th Cir.), *vacated for reh'g en banc*, 108 F.4th 786 (9th Cir. 2024) (explaining that the "proposed course of conduct" issue is resolved simply because "it is undisputed that the Second Amendment protects … the conduct involved (simple possession)"). Nothing about *Bruen* or *Range II* suggests that courts should disregard and look beyond the conduct actually criminalized by a challenged statute when considering an as-applied challenge. [3]

The government's radical reimagining of constitutional jurisprudence also would have foreclosed the outcomes in both *District of Columbia v. Heller*, 554 US. 570 (2008), and *Bruen*,

---

[3] The Third Circuit appears to have recognized a somewhat broader reading of as-applied challenges in certain contexts, though not as broad as the government posits here. *See United States v. Moore*, 111 F.4th 266 (3d Cir. 2024); *see also Quailes*, 2025 WL 225486. In an as-applied Second Amendment challenge to § 922(g)(1), the court considered that the defendant was still on supervised release for his predicate felony offense. *See Moore*, 111 F.4th 266. It, therefore, did not address permanent felony disarmament, but affirmed the defendant's conviction on the narrower ground that a felon "may be disarmed while he completes his sentence and reintegrates into society." *Id*. at 272. The court took a broader view than the defense in that case of what an "application" of § 922(g)(1) is. *See id*. at 272-73. But it did not endorse the government's view here, that facts entirely unrelated to the charged statute could be considered. To the contrary, the fact considered is directly related to the predicate felony element of § 922(g)(1)—*i.e.*, the defendant was still serving his sentence for a § 922(g)(1) predicate felony. The court only recognized that the relevant circumstances could "include facts beyond the predicate offenses alleged in the indictment." *Id*. at 273. Consideration of the ongoing predicate felony sentence is different in kind from irrelevant "conduct" that is not part of § 922(g)(1). *Moore*'s specific holding is not applicable to Mr. Trusty, and the government does not argue it is, nor cite *Moore* at all.

597 U.S. 1. *Heller* addressed a complete handgun ban in D.C., and *Bruen* addressed a proper-cause public carry licensure regime in New York. In both cases, the Supreme Court struck down the laws facially under the Second Amendment. Facial invalidation means that the law is unconstitutional in all of its applications. *See Rahimi*, 602 U.S. at 693. The government argues here that applying § 922(g)(1) requires considering the purpose for which a person would possess a firearm, rather than recognizing that a complete prohibition on firearms implicates Second Amendment conduct. But the Court did no such thing in *Heller* or *Bruen*. It found that the laws were unconstitutional in *all* applications, without insisting that every possible person subject to the laws show that they would only possess the firearm for self-defense. Clearly, a complete ban on handguns and licensure requirements for public carry implicate conduct covered by the Second Amendment. So too for a complete prohibition on firearms under § 922(g)(1).

The Second Amendment's plain text covers the conduct actually prohibited by § 922(g)(1): possession of a firearm. So the Constitution "presumptively protects that conduct" at *Bruen*'s first step. 597 U.S. at 17.

The government attempts to evade the natural alignment between the protection of the Second Amendment and the prohibition of § 922(g) by suggesting that the handgun at issue, which had a 14-round magazine, is not in common use for self-defense. ECF no. 89 at 6. But even the (pre-*Bruen*) Third Circuit decision the government relies on as suggesting larger capacity magazines are not needed for self defense contains a record indicating that "Millions of LCMs [large capacity magazines] have been sold since 1994, and 63% of gun owners reported using LCMs in their modern sporting rifles. LCMs often come factory standard with semi-automatic weapons. Gun owners use LCMs for hunting and pest control. LCMs have also been used for self-defense. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106,

8

112 (3d Cir. 2018), abrogated by *Bruen*, 597 U.S. 1 (citations omitted). On this record the court "assume[d] without deciding that LCMs are typically possessed by law-abiding citizens for lawful purposes and that they are entitled to Second Amendment protection." *Id*. at 17.

Additionally, Mr. Trusty is not charged with possessing a particular kind of firearm that the government has attempted to regulate. The government does not purport to limit through § 922(g) the type of firearm that Mr. Trusty may carry; it seeks to prevent him from carrying any gun at all.

### *BRUEN* STEP TWO:
### THE GOVERNMENT FAILS TO IDENTIFY AN ANALOGOUS HISTORICAL TRADITION TO § 922(G)(1).

The government bears the burden at *Bruen*'s second step to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. 597 U.S. at 25. The government identifies two purported historical principles that justify § 922(g)(1): (1) legislatures may disarm persons who have been convicted of serious crimes; and (2) legislatures may disarm categories of persons thought by a legislature to present a special danger of misuse. *See* ECF No. 89 at 15 *et seq*. These are, quite literally, the exact same historical principles that the government claimed supported § 922(g)(1)'s constitutionality in *Range II*. *See* Supp. Br. of Appellees ("Gov't Range Br.") at 9, *Range v. Att'y Gen.*, No. 21-2835 (3d Cir. Aug. 2, 2024). Both were rejected and should now be deemed foreclosed in this Circuit. Indeed, the government's entire historical analysis appears little changed from the briefing it submitted in *Range*. *Compare* ECF No. 89 at 15-22, *with* Gov't Range Br. at 9-22. It is inconceivable that these warmed over arguments could suffice to uphold § 922(g)(1) here, when the *en banc* has already held they are "far too broad" to support § 922(g)(1). *See Range II*, 124 F.4th at 230.

As explained below, the government, consequently, has failed to meet its burden of justifying the constitutionality of § 922(g) here as supported by a historical tradition of firearm regulation. This is a historical question and the government gets its history wrong. Under *Bruen* and its progeny, the prevailing 20th- and 21st- century norms and expectations that have sustained § 922(g) for the few decades of its existence cannot substitute for that absent *historical* foundation.

> ### a.    The government misreads *Rahimi* in an effort to resurrect the same type of legislative deference it forecloses.

Before turning to the government's proposed "principles," it must be noted that its arguments are not only now foreclosed by *Range II*, but are also premised on clear misinterpretations of *Rahimi*. The government cherry-picks language from that decision while ignoring that several of the arguments it raises now were effectively already foreclosed by the Supreme Court. Far from endorsing vague "traditions" of disarming so-called "dangerous" people, *Rahimi* demonstrates that historical principles must be more narrowly drawn.

It is true that *Rahimi* clarified that *Bruen* does not suggest a "law trapped in amber," such that modern laws could only be upheld if the government identified a founding-era "historical twin." 602 U.S. 691-92. Rather, courts must look to the "principles that underpin our regulatory tradition." *Id.* at 692. But the Court also rejected the much broader historical principle proposed by the government, that it could disarm people deemed "not responsible." *Id.* at 701-02. The government's reliance on this "tradition"—based on many of the same laws cited by the government here—ignored that the Second Amendment and state constitutions largely eliminated governmental authority to disarm those types of groups. *Id.* at 694.

 More tellingly, the Court rejected the theory on *methodological* grounds. It explained that "'[r]esponsible' is a vague term," and that it "is unclear what such a rule would entail." *Id.* at 701. *Rahimi* makes clear that any principles derived from the regulatory tradition must be narrowly

drawn, or "else [courts] risk gaming away" the Second Amendment right. *See id.* at 711 (Gorsuch, concurring). Justice Gorsuch likewise warned courts should not "try[] to glean from historic exceptions overarching 'policies,' 'purposes,' or 'values' to guide them in future cases." *Id.* at 710 (Gorsuch, J., concurring). Nor should courts "extrapolate their own broad new principles from [historical] sources." *Id.* at 712; *see also id.* at 775 (Thomas, J., dissenting) (explaining that the "Government's own evidence exemplifies the dangers of approaches based on generalized principles"). Similarly, Justice Barrett cautioned that "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 740 (Barrett, J., concurring). Indeed, "[n]ot a single Member of the Court adopt[ed] the Government's theory" "that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.'" *Id.* at 773 (Thomas, J., dissenting).

Rather, the Court constrained its historical principle to the actual purposes and function of the historical evidence—an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702. As Justice Barrett explained, the principle settled on "just the right level of generality[.]" *Id.* at 740 (Barrett, J., concurring). In this case, therefore, the government must identify a similar principle to that in *Rahimi*, one that is narrowly drawn from actual historical evidence. Instead, it has asserted principles that are "too broad" and unworkable as explained by *Range II* and just like the rejected "responsible" person principle from *Rahimi*.

### b. The government cannot evade its historical burden by citing dicta from *Heller* about felon prohibitions.

Before outlining its historical arguments, the government cites dicta from *Heller* regarding "presumptively lawful," "longstanding prohibitions on the possession of firearms by felons," ECF No. 89 at 6 (quoting *Heller*, 554 U.S. at 626-27). The Third Circuit has foreclosed reliance on this

dicta to uphold § 922(g)(1). *See Range II*, 124 F.4th at 228-29. Indeed, since *Bruen*, most circuit courts have rejected government efforts to evade historical analysis by relying on this dicta. *See United States v. Diaz*, 116 F.4th 458, 465-66 (5th Cir. 2024); *United States v. Williams*, 113 F.4th 637, 643-48 (6th Cir. 2024); *Duarte*, 101 F.4th at 668; *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). For good reason. The Supreme Court in *Heller* included assurances that it would conduct a historical analysis if and when challenges to prohibitions like § 922(g)(1) came before it. 544 U.S. at 635 (acknowledging that it did not provide historical justifications for the longstanding prohibitions and explaining "there will be time enough to expound on the historical justifications for the exceptions we have mentioned if and when those exceptions come before us"); *see also Range II*, 124 F.4th at 229 n.8. The government cannot evade that responsibility here.

### c. The purported tradition of disarming those convicted of "serious crimes" is foreclosed under *Range II*, is ahistorical, and is too vague under *Rahimi*.

The first purported historical principle offered by the government is that "legislatures may disarm persons who have been convicted of serious crimes." ECF No. 89 at 15 *et seq*. This principle is not supported by historical evidence and is inconsistent with the guidance in *Rahimi*. The Third Circuit also already rejected the exact same principle, presented nearly identically by the government in *Range II*. *See* 124 F.4th at 230-31.

The purported principle is facially inaccurate, because those convicted of serious crimes *were not* disarmed at the founding. *See Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S.1 (noting scholars have not been able to identify any founding-era laws disarming all felons). The earliest firearm restrictions for felons in the United States were passed in the 20th century. *See, e.g.*, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272-75 (2020),

and modern statutes that dispossess felons of firearms, including § 922(g)(1), bear "little resemblance to laws in effect at the time the Second Amendment was ratified[.]" *United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011); *see also NRA v. ATF*, 700 F.3d 185, 196 (5th Cir. 2012). The government has historically conceded this fact. *See United States v. Bullock*, 679 F. Supp. 3d 501, 534 (S.D. Miss. 2023), *rev'd and remanded*, No. 23060408, 2024 WL 4879467 (5th Cir. Nov. 25, 2024) (noting that, previously, the "U.S. Department of Justice formally advanced the position that early American history did not support felon disarmament").

To the contrary, there is considerable evidence that most felons were *required* to keep firearms around the founding as part of militia service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792) (requiring citizens to keep firearms, and not including felons among the exceptions); Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021) (finding no evidence that those with criminal convictions were excluded from militia duties or firearm ownership); Nicholas J. Johnson, et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 185, 191-92 (3d ed. 2022) (explaining colonies typically required indentured servants—often felons—to be armed for militia service). The Third Circuit has already similarly recognized that inclusion of young men in militias under the Second Militia Act indicates that "founding-era lawmakers believed those youth could, and indeed should, keep and bear arms." *See Lara v. Comm'r Pa. State Police*, ___ F.4th ___, 2025 WL 86539, at *11 (3d Cir. Jan. 13, 2025). The same principle applies to felons.

Though the government need not identify a "historical twin," the absence of "distinctly similar" laws from the founding is "relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. And it certainly contradicts the

government's stated principle that those convicted of "serious crimes" could historically be disarmed. The narrow principle articulated in *Rahimi*—temporary disarmament after a court finds a credible safety threat–accurately describes the underlying historical surety and affray laws. *See* 602 U.S. at 693-700. Conversely, the government's "principle"—that anyone convicted of a "serious crime" can be permanently disarmed—is entirely of its own invention, utterly divorced from the "punishment" and "disarmament" laws it cites.

    ***Punishment laws.*** The government attempts to ground this principle in historical laws permitting capital punishment and/or estate forfeiture for certain felony convictions. *See* ECF No. 89 at 15 *et seq*. Its reliance on these purported traditions is misplaced.

    *First*, *Range II* explains that:

> [The] Founding-era practice of punishing some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue here—de facto lifetime disarmament for all felonies and felony-equivalent misdemeanors—is rooted in our Nation's history and tradition. Though our dissenting colleagues read *Rahimi* as blessing disarmament as a lesser punishment generally, the Court did not do that.

*Range II*, 124 F.4th at 231. The court also easily disposed of the government's reliance on forfeiture laws. *Id.* at 231. One now-Justice on the Supreme Court has similarly shot down the government's capital punishment argument, pointing out the absurdity if the same reasoning were used to argue that felons lack a right to free speech because of the historical execution of some felons. *See Kanter*, 919 F.3d at 461-62 (Barrett, J., dissenting). Unlike living felons, deceased individuals do not have a right to armed self-defense. *See id.* ("The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."). As one district court has explained in rejecting this historical analogy: "the value of historical analogues that draw on the harshness of felony penalties *per se* is limited: 18 U.S.C. §922(g)(1) relies upon a prior

14

conviction and one's *status* as a felon to deprive his right to possess weapons after *returning to society*." *United States v. Zelaya Hernandez*, 678 F. Supp. 3d 850, 856 (N.D. Tex. 2023); *see also Kanter*, 919 F.3d at 461 (Barrett, J., dissenting) ("Because they did not go hand-in-hand, the argument that the severity of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided.").

*Second*, neither capital punishment nor estate forfeiture is a *firearm* regulation, so they are not properly considered under *Bruen* or *Rahimi*. *See Bruen*, 597 U.S. at 24 (holding the government has the burden to show the challenged regulation is "consistent with the Nation's historical tradition of *firearm regulation*") (emphasis added); *cf. Rahimi*, 602 U.S. at 696 ("Importantly for this case, the surety laws also target the misuse of firearms."). Indeed, every historical law considered in *Bruen* was an explicit firearm regulation. *See* 597 U.S. at 38-66.

*Third*, the government's proposition is ahistorical. Death was *not* the "standard penalty for all serious crimes at the Founding," as the government incorrectly posits. *See* ECF No. 89 at 15. "Capital punishment was not as common a penalty in the American colonies" as in England, and the colonies recognized "far fewer" capital crimes. *See Furman v. Georgia*, 408 U.S. 238, 335 (1972) (Marshall, J., concurring). "[D]uring the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting). The colonies used the death penalty sparingly and, by the founding, states did not treat most felonies as capital. *Id*. New Hampshire, for example, explained in its constitution that "no wise legislature … will afix the same punishment to the crime of theft, forgery and the like, which they do to those of murder and treason[.]" *Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) (opinion of Scalia, J.) (citing N.H. Const., Pt. I, Art. XVIII (1784)). Massachusetts excluded crimes like arson, burglary, and robbery from its list of capital offenses, even as early as the 17th century.

*See* Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 349 (1982) [Verrilli]; *see also Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) ("property crimes including variations on theft, burglary, and robbery were, on the whole, not capital") (cleaned up).

The Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790) illustrates this point. That very law only recognized a select few felonies as capital: treason, murder, certain piracy and felony on the high seas offenses, prison break for capital offenders, and counterfeiting. *See* Crimes Act, 1 Cong. Ch. 9, 1 Stat. 112 (1790). Conversely, the Crimes Act enumerated far more crimes that were *not* capital, including: manslaughter, misprision of treason, accessory, interference with diplomatic immunity, passport obstruction, mayhem, perjury, obstruction, judicial bribery, and property crimes such as larceny. *Id*. The government is simply wrong to imply that the body of capital offenses from the founding serve as a comparable proxy for *all* felonies today. Assuredly, more crimes were capital at the founding than today. But most modern felonies that implicate § 922(g)(1)—including Mr. Trusty' predicate drug convictions—were not capital at the founding.

The Government's description of the history of capital punishment is inaccurate, and whether it is more "burdensome" than disarmament or not, the fact that certain felons were executed at the founding says nothing about whether all felons can be permanently disarmed today.

***Founding-era disarmament laws.*** The government next argues that founding-era disarmament laws—primarily those based on disloyal activities during the American Revolution— prove a historical tradition of disarming those convicted of serious crimes. ECF No. 89 at 16 *et seq*. It is wrong.

*First*, as discussed above, there is no historical evidence that people were specifically disarmed based on felony convictions prior to the 20th century. The government ignores this

critical fact and glosses over how disarmament of political opponents or disloyal citizens is meaningfully different in scope and purpose from disarming all felons.

*Second*, as with other historical arguments borrowed from the government's *Range* briefing, the Third Circuit has already rejected this analogy. *See Range II*, 124 F.4th at 229-30. The court explained that Founding-era disarmament of distrusted groups like "Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be far too broad." *Id.* (quoting *Bruen*, 597 U.S. at 31). It specifically addressed the reasons behind disarming Loyalists, and explained that they were not analogous. *Id.* These types of laws were not just based on public safety concerns, but had their own "unique socio-political motivations." *United States v. Connelly*, 117 F.4th 269, 278 (5th Cir. 2024). "The Founders did not disarm English Loyalists because they were believed to lack self-control; it was because they were viewed as political threats to our nascent nation's integrity." *Id*. These laws, therefore, have a profoundly different justification from § 922(g)(1). *See Rahimi*, 602 U.S. at 692 (explaining that "[w]hy and how the regulation burdens the right are central to" the historical inquiry). Moreover there "is a solid basis in history to infer that states could lawfully disarm these groups [including British Loyalists] because they were written out of the people altogether." *Duarte*, 101 F.4th at 679 (cleaned up). This would not apply to Mr. Trusty, who is among "the people" protected by the Constitution under present law. *See Range II*, 124 F.4th at 226-27.

*Third*, the government puzzlingly relies on a historical tradition directly repudiated by the Second Amendment—the disarmament of political opponents by deeming them "dangerous." For example, it cites favorably to the English Militia Act of 1662, 13 & 14 Car. 2, c. 3. *See* ECF No. 89 at 16. But the Militia Act was generally understood as an abhorrent pretext for disarming

Protestants and political opponents. *See* Hon. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 401–02 (2019). "So the Militia Act, passed to disarm political dissidents and reined in well before the founding by the English Bill of Rights, almost certainly does not survive the Second Amendment's categorical command …" *Connelly*, 117 F.4th at 278. The Declaration of Rights codified after the Glorious Revolution in 1688—a precursor to the Second Amendment—explicitly *rejected* abuses like the Militia Act and ensured that Protestants would not be disarmed. *See Rahimi*, 602 U.S. at 694; *Heller*, 554 U.S. at 593; Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 Wm. & Mary Bill Rts. J. 1037, 1058 (2009); Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 114–18 (1994).

"By the time of the founding … state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." *Rahimi*, 602 U.S. at 694. Justice Thomas further explained—in a portion of his *Rahimi* dissent not disputed by the majority—the "Second Amendment stems from English resistance *against* 'dangerous' person laws … It would be passing strange to permit the Government to resurrect those selfsame 'dangerous' person laws to chip away at the Amendment's guarantee." *Id.* at 754 (Thomas, J., dissenting).

*Fourth*, the government relies extensively on historical *proposals* that were never adopted as laws or constitutional amendments. *See* ECF 21 at 25-26. It specifically highlights a proposal at Pennsylvania's ratifying convention and 19th century proposed model legal codes for Louisiana. It is, however, improper under *Bruen* to consider rejected legal proposals to interpret the scope of

the Second Amendment. Indeed, the *Heller* Court explained it "is dubious to rely on such history[.]" 554 U.S. at 603; *see also Kanter*, 919 F.3d at 454-56 (Barrett, J., dissenting).

The government's efforts to cobble together a broad historical principle from wholly unrelated historical evidence flies in the face of *Bruen*, *Rahimi*, and *Range II*. It will likely argue that the defense is simply demanding an exact "historical twin" and that *Rahimi* endorsed this type of freewheeling reasoning by analogy. But the government is resorting to the exact type of broad and unworkable historical principle that was *rejected* by *Rahimi*. Indeed, it is a verbatim recitation of an historical principle called "too broad" in *Range II*. Its overly broad reading of capital punishment would permit not only disarmament, but *any* constitutional deprivation following a felony conviction. This is not the type of narrow principle identified in *Rahimi*. Rather, the government seeks to "glean from historic exceptions overarching policies" that would justify countless categorical restrictions. *See Rahimi*, 602 U.S. at 710 (Gorsuch, J., concurring). This is further evidenced by the breadth of modern laws the government claims are justified by the same supposed historical evidence, as it has cited the same historical evidence and principles to justify disarming felons, drug addicts, undocumented persons, and indictees. *See, e.g.*, *United States v. Benito*, ___ F. Supp. 3d ___, 2024 WL 3296944, at *6-7 (S.D. Miss. Jul. 3, 2024) (discussing and rejecting government's reliance on the same "dangerousness" laws to support modern law disarming undocumented persons). This is not a narrow historical principle; it is a policy wish list masquerading as historical evidence.

   d.  **The government's theory that legislatures are permitted to identify categories of persons to disarm based on dangerousness was rejected in *Range II*, is ahistorical, and is contrary to *Bruen* and *Rahimi*.**

The government also purports to identify a second historical principle, that legislatures can disarm "groups deemed dangerous by a legislature." ECF No. 89 at 19. The argument does not merit serious response. It is an unsubtle attempt to resurrect arguments already foreclosed by the

Supreme Court—that courts should defer to legislatures to disarm those they deem "dangerous" or "irresponsible." Furthermore, it was just rejected by the *en banc* Third Circuit in *Range II*.

The most fundamental holding of *Bruen* is that courts must not "defer to the determinations of legislatures" by employing means-end scrutiny in Second Amendment challenges. 597 U.S. at 26. But the government asks for even greater deference here, insisting that there is a historical tradition of letting legislatures "make categorical judgments about dangerousness" and thereby deeming certain categories of people unfit to keep firearms. *See* ECF No. 89 at 20. It does not even employ means-end scrutiny, but seems to suggest that this type of legislative determination cannot be second-guessed by courts at all. The government cannot circumvent *Bruen*'s admonitions by repackaging legislative deference as a historical principle. In *Range II*, the court explained that similar arguments "devolve[d] authority to legislators to decide whom to exclude from 'the people,'" and that "such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." 124 F.4th at 228.

Moreover, *Rahimi* rejects the substance of the government's proposed principles. The government recasts dicta from *Rahimi*—that the Court was not suggesting the government could not disarm "categories of persons thought by a legislature to present a special danger of misuse," 602 U.S. at 698—as a historical principle, and then broadens it beyond recognition. The government collects laws (largely from the 19th century and later)[4] that disarmed loyalists,

---

[4] The government acknowledges that the Third Circuit has already generally constrained historical evidence in this context to that from the founding era. *See* ECF No. 89 at 15 n.7 (citing *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024)). Nevertheless, it asks the Court to disregard that binding precedent based on its own misreading of *Bruen* and *Rahimi*. Far from contradicting *Lara*, the Supreme Court has confirmed that historical inquiries in this context should look primarily to founding-era evidence. *See, e.g.*, *Bruen*, 597 U.S. at 35 ("we must guard against giving postenactment history more weight than it can rightly bear"); *see also Rahimi*, 602 U.S. at 737 (Barrett, J., concurring) ("the history that matters most is the history surrounding the ratification of the text"). Indeed, insofar as the *Bruen* Court looked to 19th century historical

juveniles, vagrants, those of "unsound mind," the intoxicated, and others. And, from that, the government describes a historical principle that legislatures have the "power to make categorical judgments about dangerousness," and then disarm those categories. ECF No. 89 at 20. Again, unlike the narrowly drawn principle in *Rahimi*, this principle is disconnected from the actual historical evidence, and operates "at such a high level of generality that it waters down the right." *See Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

Indeed, the government repeats the same error it committed in *Rahimi* in advancing its "responsible" theory. As noted, *Rahimi* easily rejected the government's primary argument that the Second Amendment allows Congress to disarm anyone who is not "responsible." *Id*. at 701-02, 772-73 (Thomas, dissenting). What is true of "responsible" is equally true of the government's proposed tests. The government in *Rahimi* treated the term "not responsible" as synonymous with "dangerous." *Rahimi*, 602 U.S. at 773 (citing Tr. of Oral Arg. at 10-11 (government confirming it uses the terms "not responsible" and "dangerous" interchangeably)) (Thomas, J., dissenting); *see also* Tr. of Oral Arg. at 11 (positing there was "no daylight at all … between not responsible and

---

evidence, it was because *state* laws (unlike *federal* laws) arguably implicate the Fourteenth Amendment (ratified in 1868), because it incorporated the Second Amendment against the states. *See* 597 U.S. at 37-38. But that "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id*. at 83 (Barrett, J., concurring). The government misleadingly points to *Rahimi*'s discussion of "the legal landscape from the 1200s through the 1800s," *see* ECF No. 89 at 15 n.7, while ignoring that much of this historical evidence was not treated as part of the historical tradition supporting the challenged law, *see Rahimi*, 602 U.S. at 694 (after discussing earlier historical evidence explaining that "[b]y the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic"). Rather, it was essential to *Rahimi*'s holding that the relevant historical principle was from the founding. *See* 597 U.S. at 1901 (twice describing the relevant surety and affray laws as "founding era regimes"). Indeed, the Third Circuit has since *Rahimi* re-issued a similar opinion in *Lara*, holding the same, and reconciling its constraint to founding-era evidence with *Bruen* and *Rahimi*. *See Lara*, 2025 WL 86539, at *8-10. This Court is bound by *Lara*, *Bruen*, and *Rahimi* to focus its historical inquiry on founding-era evidence.

dangerous"). Dangerous is just as "vague" as "responsible," *see Rahimi*, 602 U.S. at 701. Moreover, the government effectively resurrects its proposed "law-abiding" test, and "responsible" and "law-abiding" derive from the same source: *Heller*'s and *Bruen*'s use of those words to describe the challengers in those cases. *See Rahimi*, 602 U.S. at 701. As the *Range II* court rightly found and the Supreme Court confirmed in *Rahimi*, those references were dicta because *Heller* and *Bruen* "said nothing about the status of citizens who were not 'responsible'" or "law-abiding"—the questions were "simply not presented." *Rahimi*, 602 U.S. at 701-02; *Range*, 124 F.4th at 226.  Likewise, the term "serious" is just as "vague" as the term "responsible." *Rahimi*, 602 U.S. at 701-02.

The government does not try to argue that the *Rahimi* principle itself supports the constitutionality of § 922(g)(1), "and with good reason." *See Range*, 124 F.4th at 230. That principle was limited to "temporary disarmament," and only after a judicial finding of a specific credible physical threat to another person. *Rahimi*, 602 U.S. at 702. Instead, the government makes the same error it recently made in *Range II*. It asks the Court to extrapolate a broader principle that anybody it deems "dangerous" can be disarmed. The argument has already been foreclosed by *Range II*. And while some have misread *Range II* to have implicitly adopted a broader dangerousness standard, that is simply not the case. *Cf. Range II*, 124 F.4th at 230 ("*Rahimi* did bless disarming (at least temporarily) physically dangerous people."). All *Range II* did was acknowledge the specific principle from *Rahimi*, note that it did not apply, and reject all of the government efforts to broaden that principle. *See* 124 F.4th at 230-31.

Thus, the "dangerousness" and "serious crimes" arguments just repackage the government's "responsible" citizen theory. It was *this* argument—*i.e.*, irresponsibility justifies disarmament—that the Supreme Court rejected in *Rahimi*. 602 U.S. at 701-02. And it was this

argument, verbatim, that the *en banc* Third Circuit rejected in *Range II*. 124 F.4th at 230-31. It necessarily follows that the government here cannot defend § 922(g)(1) by invoking a purported tradition of disarming categories of people thought by the legislature pose a "danger" or are otherwise not "law-abiding."

### A. The government has not shown a historical tradition to support § 922(g)(1)'s constitutionality either facially *or* as applied.

Mr. Trusty challenged § 922(g)(1) both facially and as applied to him. The government has not met its burden to show historical evidence sufficient to defeat either challenge. Mr. Trusty maintains that § 922(g)(1) is unconstitutional on its face—i.e., in *all* of its applications. *See Rahimi*, 602 U.S. at 693 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[5] But this Court likely need not reach that question. Even when casting doubt on the constitutionality of firearms laws more broadly, courts have typically exercised restraint and resolved as-applied questions first. *See, e.g.*, *Harper*, 689 F. Supp. 3d at 35 (declining to reach the facial question after finding § 922(g)(1) unconstitutional as applied to the defendant).

Here, § 922(g)(1) is plainly unconstitutional, at least as applied to Mr. Trusty, because the government's historical principles do not support that people like him—that is, someone whose prior criminal history was limited to non-violent drug offenses and who had finished his one custodial sentence over a decade before his § 922(g) arrest—could have been permanently disarmed at the founding.[6] *See Range II*, 124 F.4th at 232 (holding the government failed to show

---

[5] The Third Circuit has held that § 922(g)(1) is constitutional as applied to those still on supervised released for their underlying felony convictions. *See Moore*, 111 F.4th 266. This holding appears currently to foreclose a facially unconstitutional finding by this Court, which is bound by *Moore*. *See Rahimi*, 602 U.S. at 693 (holding that facial challenges must show the law is unconstitutional in all of its applications). Defendant nevertheless raises this facial challenge to preserve the issue for appeal.

[6] A recent decision by the Third Circuit, *Pitsilides v. Barr*, No. 21-3320, 2025 WL 441757 (3d Cir. Feb. 10, 2025), remanded for factual development of the record in a civil matter in which the issue

a "longstanding history and tradition of depriving people like Range of their firearms"). Courts have found § 922(g)(1) unconstitutional as applied to those with more serious criminal histories than Mr. Trusty. *See, e.g.*, *United States v. Williams*, 718 F. Supp. 3d 651 (E.D. Mich. Feb. 22, 2024) (murder conviction); *United States v. Leblanc*, 707 F. Supp. 3d 617 (M.D. La. 2023) (armed robbery conviction); *United States v. Griffin*, 704 F. Supp. 3d 851 (N.D. Ill. 2023) (robbery and drug convictions).

Indeed, even if the Court accepted the government's analogy to capital punishment, a "more faithful application of *Bruen*" would require the government to identify founding-era felonies similar to the underlying predicates here, that "would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate." *Duarte*, 101 F.4th at 690. That is, founding-era capital punishment practice could only plausibly support disarmament of the types of felons subject to capital punishment. The Fifth Circuit effectively agreed in *United States v. Diaz*, 116 F.4th 458, 467-70 (5th Cir. 2024), a case the government misleadingly cites in support of its arguments. *See* ECF No. 89 at 12. In fact, *Diaz* rejected many arguments raised by the government there and here. The Fifth Circuit *did* recognize that the historic use of capital punishment for the specific felony of theft could support the constitutionality of § 922(g)(1) as applied to somebody with the same predicate conviction today. *Diaz*, 116 F.4th at 467-70. But it rejected the effort to generalize that principle to all felonies, noting "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Id.* at

---

of dangerousness was at issue. The Third Circuit's decision in *Pitsilides* hints at, but does not concretely provide, the methodological approach that might be used to match a historical principle to a particular case, at least in the civil context in which *Pitsilides* arose. The unusual posture of *Pitsilides* (and its remand for further factfinding rather than resolving the appeal) are such that while the opinion raises questions about what answers the Circuit may ultimately provide, it does not offer those answers, particularly in the context of a criminal § 922(g) proceeding.

469. The court did "not foreclose future as-applied challenges by defendants with different predicate convictions." *Id*. at 470 n.4. It, therefore, appeared to join the Ninth Circuit in recognizing that the government would need to show that the felony predicate in a § 922(g)(1) case would have been a felony subject to execution or permanent disarmament at the founding. *See Duarte*, 110 F.4th at 689-90. The government has not done so here—because there is no such historical evidence.

Because the government has failed to meet its burden, the Court should find § 922(g)(1) unconstitutional as applied to Mr. Trusty.

Respectfully Submitted,

THE DEFENDANT,

Hanieff Trusty

FEDERAL DEFENDER OFFICE

/s/ James P. Maguire

_____

James P. Maguire
Assistant Federal Public Defender
800 Cooper Street, Suite 350
Camden, NJ 08102
james_maguire@fd.org
609-649-9924

Dated: March 7, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

s/ James P. Maguire
James P. Maguire